UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

S.B., individually, and on behalf of her child, A.W.,

       Plaintiff-Appellants,

-vs.-

NEW YORK CITY DEPARTMENT OF EDUCATION,

       Defendant-Appellee.

------------------------------------------------------------------------ x

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' SUMMARY JUDGMENT MOTION**

No. 21-cv-9139

  The Plaintiffs submit this Memorandum of Law in support of their Summary Judgment Motion, brought pursuant to the Individuals with Disabilities Education Improvement Act 2004 ("IDEA"), Section 504 of the Rehabilitation Act of 1972 ("Section 504"), the Americans with Disabilities Act ("ADA"), and Article 89 of the New York Education Law (specifically N.Y. Education Law §4401, *et. seq.*), the Due Process Clause of the 14th Amendment of the U.S. Constitution, 42 U.S.C. §1983, and all of the above's implementing regulations, regarding their claims that the New York City Department of Education ("DOE") discriminated against their son on the basis of his disability and deprived him of a free and appropriate public education (a "FAPE") for his 2020 - 2021 school year ("SY at Issue").

  **I. THE COURT SHOULD FIND IN FAVOR OF S.B. ON ALL CLAIMS RAISED**

  The IDEA requires that each eligible child with a disability receive a FAPE that includes, *inter alia*, "an appropriate . . . elementary or secondary education in the state." 20 U.S.C. §§1401(9), 1414(d)(2)(A). A FAPE must include special education and related services that are "designed to

1

meet [the child's] unique needs and prepare [him or her] for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A).

Moreover, the U.S. Supreme Court recently clarified that a child's IEP must be evaluated based on the child's ability to make appropriate progress and be appropriately ambitious in light of the child's unique circumstances. *Endrew F. v. Douglas County School District*, 580 U.S. __, 14 (2017). Even if the student is not able to be fully integrated into the classroom and achieve passing marks and grade level advancement, the school is still required to ensure the student is given an IEP that requires not just academic but also functional progress. *Id*. Moreover, although the goals may differ for students, each child should have the chance to meet challenging objectives. *Id*. The *Endrew F.* decision also clarified that an IEP must include goals and services to enable a child to make both academic and functional progress. *Id*.

A FAPE is offered when (a) the DOE complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed through the IDEA's procedures is reasonably calculated to enable a student. to receive educational benefits. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179-181, 200-201 (1982). The IHO can find a FAPE denied on substantive grounds or based upon individual or collective procedural violations. *L.O. v. New York City Dep't of Educ*., No. 15-1019, 2016 WL 2942301 (2d Cir. May 20, 2016). A failure to implement substantial or significant provisions of the IEP constitutes a material procedural violation and a deprivation of a FAPE. *See A.P. v. Woodstock Bd. of Educ.,* 370 Fed.Appx. 202, 205 (2d Cir. 2010); *Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 349 (5th Cir.2000); *Van Duyn v. Baker Sch. Dist*., 502 F.3d 811, 822 (9th Cir. 2007).

The test that is traditionally applied to tuition cases involving a unilateral placement has come to be known as the *Burlington/Carter* "3-pronged" test. *See School Comm. of Burlington v.*

2

*Dep't of Ed. Of Mass.*, 471 U.S. 359 (1985); *Florence County School Dist. Four v. Carter,* 510 U.S. 7 (1993).  Under the *Burlington/Carter* analysis, the DOE may be required to pay for a unilateral placement in a private school following a three-pronged analysis:  (1) the DOE did not offer the child a FAPE, (2) the unilateral placement is appropriate, and (3) equitable considerations favor the Parent. *Id.*

        a.  **The Court Should Find that S.B.'s is entitled to her requested SUWS Relief for the SY at Issue.**

The Court should find that the SRO erred in his legal analysis, and hold that the IHO had the broad discretion to apply a number of precedents and/or regulatory provisions, which all provide essentially the same scope of review to determine whether SUWS was appropriate for A.W., which is the holistic approach considering the totality of circumstances indicating the specialization of the program, and whether it enabled A.W. to receive educational benefits.

Upon a determination that the educational agency denied the Parent and Student a FAPE, fact-finders have broad discretion to develop equitable relief. *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 2022 (2016), *reh'g denied,* 136 S. Ct. 2546 (2016) ("[e]quitable considerations are relevant in fashioning relief and the court enjoys broad discretion in so doing") (quoting *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993)). *See also Reid ex. rel. Reid v. Dist. Of Columbia*, 401 F.3d 516, 522-23 (D.C. Cir. 2005); *M.W. v. NYC Dep't of Educ.*, No. 15-cv-5029, 2015 WL 5025368 (S.D.N.Y. August 25, 2015).

An "appropriate" private placement provides "educational instruction specifically designed to meet the unique needs of the student," *Gagliardo v. Arlington Cent. Sch. Dist*, 489 F.3d 105, 112 (2d. Cir. 2007), yet it "need not meet stated education standards or requirements" or the "[IDEA] definition of a free and appropriate public education," *Frank G. v. Bd. of Educ.,* 459 F.3d 356, 364 (2d. Cir. 2006). No one factor is deemed dispositive in determining whether a

private placement is appropriate; rather, the fact finder must consider the "totality of the circumstances." *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459 F.3d at 364); *see also A.D. v. Bd. of Educ. of the City Sch. Dist.,* 690 F. Supp. 2d 193 (S.D.N.Y. 2010). In general, reports of progress and assessments from a student's private school weighs in favor of the school's appropriateness. *A.D.*, 690 F. Supp.2d at 208.

NYSED guidance provides, *"1. How is special education defined in New York State (NYS)? -* Special education means specially designed individualized or group instruction or special services or programs and special transportation, provided at no cost to the parent, to meet the unique needs of students with disabilities. 1) Such instruction includes but is not limited to that conducted in classrooms, homes, hospitals, institutions and in other settings." THE NEW YORK STATE EDUCATION DEPARTMENT - OFFICE OF P-12 EDUCATION FOR SPECIAL EDUCATION, Pg. 6, Para. 5 (April 2008 - Updated November 2013)(*emphasis added*), *available at*: http://www.p12.nysed.gov/specialed/publications/policy/schoolagecontinuum-revNov13.htm. Pg. 3, Para. 1.[1] Further, "Related services means developmental, corrective, and other supportive services as are required to assist a student with a disability and includes . . . appropriate access to recreation, including therapeutic recreation, other appropriate developmental or corrective support services, and other appropriate support services and includes the early identification and assessment of disabling conditions in students." 8 NYCRR § 200.1 (qq) (emphasis added).

---

[1] Further, "Related services means developmental, corrective, and other supportive services as are required to assist a student with a disability and includes . . . appropriate access to recreation, including therapeutic recreation, other appropriate developmental or corrective support services, and other appropriate support services and includes the early identification and assessment of disabling conditions in students." 8 NYCRR § 200.1 (qq) (emphasis added). Additionally, **"**Supplementary aids and services means aids, services, and other supports that are provided in regular education classes, other education-related settings and in extracurricular and nonacademic settings to enable students with disabilities to be educated with nondisabled students to the maximum extent appropriate in accordance with the least restrictive environment. 8 NYCRR § 200.1 (bbb) (emphasis added).

Additionally, **"Supplementary aids and services means aids, services, and other supports that are provided in regular education classes, other education-related settings and in extracurricular and nonacademic settings to enable students with disabilities to be educated with nondisabled students to the maximum extent appropriate in accordance with the least restrictive environment. 8 NYCRR § 200.1 (bbb) (emphasis added).

The Second Circuit has applied the legal analysis argued by S.B. that for non-unilateral placements (*i.e.,* placements obtained in the utter absence of a placement offer from the DOE), the question still turns on a holistic review of the appropriateness factors, but the premise excludes that the parents were provided an alternative by the DOE, which adds the equitable consideration into the IHO's appropriateness review, which is essentially an appropriateness analysis based on the totality of the circumstances.[2]

In *Frank G. v. Board of Educ. of Hyde Park*, the Second Circuit confirmed an IHO's award for wilderness therapy relief, noting that both Second Nature and Vista were private accredited therapeutic placements approved by the appropriate state licensing agencies, and that

---

[2] "[The authority to grant reimbursement is discretionary, and therefore, "equitable considerations" relative to the reasonableness of the parents' action are relevant in fashioning relief. Frank G., 459 F.3d at 364. Nevertheless, the Court should consider the same criteria applied in determining whether the LEA placement is appropriate and assess the record for objective evidence indicative of whether the student was likely to make progress or regress in the placement. Gagliardo v. Arlington Central Sch. Dist., 489 F.3d 105, 113 (2d Cir. 2007). Courts should consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." rank G., 459 F.3d at 364. "While reimbursement is not barred because the private school fails to meet the standards of the state educational agency, parents are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.'" *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26 (1st Cir. 2002) (quoting *Carter*, 510 U.S. at 13-15, 126 L. Ed. 2d 284, 114 S. Ct. 361). As to the restrictive nature of residential placements, parents seeking an alternative placement may not be subject to the same mainstreaming requirements as a school board. *See M.S. v. Bd. of Educ. of City Sch. Dist. of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000). "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302.  "States may not escape responsibility for the costs properly associated with a residential placement simply by stating that the placement addresses physical, emotional, psychological, or behavioral difficulties rather than or in addition to educational problems." *Vander Malle v. Ambach*, 667 F. Supp. 1015, 1039 (S.D.N.Y. 1987).

the testimony presented at the due process hearing regarding the appropriateness of the programs, how they met M.M.'s needs and M.M.'s progress "was essentially unchallenged." 459 F.3d 356, 364 (2d Cir. 2006), Here, the same is true, the DOE lacked any conflicting rebuttal evidence, and the Record shows that SUWS is a North Carolina state approved program with evidence to support that the Outdoor Behavioral Healthcare in tandem with the milieu approach has resulted in substantial progress for children experiencing emotional dysregulations that rise to the degree of disabling when in effect. CR 493-497.

The First Circuit has issued clear guidance on the standard for determining the appropriateness for placing a student in a wilderness program, which largely turns on the severity of the student's needs, and their inability to function in an alternative academic setting. *Lamoine Sch. Comm. v Ms. Z,* 353 F. Supp. 2d at 22-41 [*hereafter referred to as Lamoine*]. Coincidentally, the First Circuit analyzed the same wilderness therapy program that the DOE is disputing here, i.*e*., SUWS Carolinas. There, the court found SUWS to be appropriate in light of the program and the student's need for that quality of intervention. The court rejected the petitioner's challenges to the nontraditional elements of the of the SUWS wilderness therapy model (many of which the DOE has raised here in its RFR here– *see immediately below*), which included: "(1) SUWS was not the least restrictive placement, because [another placement] was 2,000 miles away from home; (2) SUWS is not certified as a special education program nor are there any certified special education teachers at SUWS; and (3) the SUWS program offers no academic services." *Compare id.* at 62 with RFR at pgs. 7-10. The court rejected the educational agency's limited scope standard of appropriateness, as it proffered a generic standard of progress that would not be based on the student's needs, particularly where many students with high capacities for acquiring academic skills do not progress due to functional struggles preventing them from engaging educationally.

Further, in *Lamoine*, the First Circuit disagreed with the educational agency's arguments, and held: "SUWS is "designed to be a powerful intervention for students that need structure, supportive counseling, motivational improvement, and the development of self-esteem, self-reliance, and self-respect." (*id.* at 69, 352). All students are expected to complete a rigorous course of experiential instruction that addresses Creative Writing, Healthy Living, Psychology, Physical Education, Social Studies, Outdoor Leadership, English, Environmental Studies, First Aid, Personal Development, and Home Economics. (*id.* at 69, 352). Students are under twenty-four-hour supervision. (*id.* at 352). The program involved being with a group of six or seven students in the wilderness, and due to the rolling admissions, student are provided an opportunity to take pride in a leadership role for assisting new students to acquire the wilderness survival skills, as A.W. did here." (*Compare id.* at 718 with CR 165, 185).[3]

Here, in his Decision, the SRO failed to identify and apply the statutory laws, regulatory guidance, and *Frank G.* to his analysis of the appropriateness of the SUWS Relief, all of which were binding as either the federal law, New York State's implementing regulations, and/or the leading Second Circuit precedent. *See* CR at 23. Instead, the SRO adopted outlying case precedents from alternative circuits to apply a heightened burden of proof upon S.B. that is in conflict with the totality of circumstances approach. *Id.* The SRO cited to standards such as, "inextricably intertwined, . . . primarily oriented,  . . . and necessary for educational purposes" as the legal

---

[3] This standard has been assumed and applied by both the Second Circuit and Supreme Court, As to the restrictive nature of residential placements, parents seeking an alternative placement may not be subject to the same mainstreaming requirements as a school board. *See M.S. v. Bd. of Educ. of City Sch. Dist. of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000), *cert. denied*, 532 U.S. 942, 149 L. Ed. 2d 346, 121 S. Ct. 1403 (2001). If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302.  "States may not escape responsibility for the costs properly associated with a residential placement simply by stating that the placement addresses physical, emotional, psychological, or behavioral difficulties rather than or in addition to." *Id.*

standards for determining when therapeutic relief is appropriate, without addressing the proper authorities and binding precedents from the Second Circuit. *Id*.

As such, the Court should find that the SRO erred as a matter of law in denying S.B. the requested SUWS Relief.

> ### b. *Under a proper application of the binding law, as applied by the IHO, the Record shows that the SUWS Relief was appropriate.*

The Court should find that S.B is entitled to reimbursement for the expenses incurred relative to A.W.'s SUWS placement under either the IDEA or Section 504.  S.B. sought professional consultation in order to identify an appropriate placement, she reviewed the SUWS program thoughtfully, and ultimately, because the SUWS program provided the necessary therapeutic intervention A.W. needed, utilizing peer reviewed and research strategies with due safety measures in place at all times. CR 304-310.

Here, the evidence showed that the that A.W. required an interim therapeutic intervention of the highest degree in order to enable him to transition back into a less restrictive therapeutic environment with academic instruction available, particularly where Bellevue ejected A.W. without care as to his lack of a placement. CR 304, 706-714. S.B. introduced documentary evidence describing: A.W.'s Season's program in detail (CR 490-499), which included the type of therapy provided and the state-based certifications of the program; the qualifications and experience of the witness testifying for SUWS (CR 489); the curriculum of the program (CR 498-513) and the progress setting and monitoring of the program (CR 514-517).

The testimony of Erica Thiessen, Clinical Director of SUWS, established in even greater detail a description of the environmental setting and nature of the program (CR 150-152, 155), A.W.'s mil lieu interventions as provided throughout his entire time at SUWS (CR 157, 200-201), the nature of specific interventions provided by A.W.'s therapists (*see* CR 194, 201-202),

8

including the general therapeutic interventions that were implemented by all employees, as trained by the SUWS management. *Id. See* CR 150-218 *generally.* When questioned, Ms. Thiessen also provided substantial content regarding transitioning services, additional therapeutic strategies used, and indicated how all of A.W.'s services enabled him to transition to Wediko, particularly when she expressed that unlike Bellevue Hospital, Acelin had a safe placement at SUWS until an appropriate alternative could be obtained. CR 206-213. Further, the Record shows that A.W. successfully transferred back to a credit-bearing program with Wediko after his interim placement at SUWS. CR 229-232, 240, 248-249, 257-258.

As such, the Court should find that when applying the proper legal standards, SUWS was appropriate, equitable relief for A.W.'s unique circumstances.

## II.     CONCLUSION AND REQUESTED RELIEF

Wherefore, Plaintiffs respectfully request that the Court award the Plaintiffs the following terms of declaratory, equitable, and appropriate relief:

(a.)     a Review the SRO's Decision *de novo,* a Reversal the SRO's legal conclusion, and a Declaration that S.B. had a legal right to appropriate compensatory educational services, the appropriateness of which to be based upon A.W.'s unique circumstances and the relief sought;

(b.)     A Declaration that pursuant to the IDEA and New York State implementing laws and regulations, that the Plaintiffs' SUWS Relief was appropriate in light of A.W.'s unique needs and the specialized services and benefits provided by the SUWS Program;

(c.) a Determination affirming the IHO's FOFD dated May 23, 2021, including those determinations and awards reversed by the SRO, regarding fees, expenses, and related costs incurred relative to A.W.'s attendance to the SUWS Program.

(d.) a Determination, pursuant to Section 504, that Plaintiffs are entitled to the SUWS Relief as appropriate and equitable compensatory educational services for the Defendant's proven FAPE deprivations, and the IHO's broad discretion in awarding equitable relief;

(e.) an Order awarding the Plaintiffs all expenses, fees, and costs incurred and considered as S.B.'s requested SUWS Relief;

(f.) an Order awarding the Plaintiff's all legal fees, and otherwise costs, expenses, and interest accrued in associated with this action and the prior proceeding and administrative appeal; and

(g.) an Order for such other relief as may be appropriate.

Dated: <u>January 24, 2022</u>
New York, New York

Respectfully submitted,

*Noelle Boostani*
_____

Noelle, Boostani, Esq.
Law Office of Noelle Boostani
Attorney for the Plaintiffs
1634 Church Ave. Apt. 8A
Brooklyn, NY 11226
T (727) 417 – 2609
F (646) 224 – 8472
Boostani@KidsWithSpecialMinds.com