UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
S.B., et al.,                                               :
                                       Plaintiffs,          :    21 Civ. 9139 (LGS)
                                                            :
                    -against-                               :    **OPINION & ORDER**
                                                            :
THE NEW YORK CITY DEPARTMENT OF                             :
EDUCATION,                                                  :
                                       Defendant.           :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Plaintiffs S.B. and A.W., individually and on behalf of A.P., bring this action against the New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Plaintiffs seek review of the August 5, 2021, decision of the New York State Review Officer ("SRO Decision") *reversing* the decision of the Impartial Hearing Officer ("IHO Decision"), which found that the private school placement was an appropriate placement for A.W. for the 2020-2021 school year. The parties cross-moved for summary judgment. For the reasons below, Plaintiffs' motion is denied, and Defendant's motion is granted.

I.      STATUTORY FRAMEWORK

The IDEA mandates that states receiving federal special education funding provide disabled children with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016). "The IDEA also requires that school districts create an individualized education program ("IEP") for each qualifying child." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 133 (2d Cir. 2019). An IEP is a "written statement that sets out the child's present educational performance,

establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* (internal quotation marks omitted).

If a parent believes that the DOE has failed to provide a FAPE to his or her child, the parent "may enroll the child in a private school at their own financial risk and seek retroactive reimbursement from the school district for the cost of the private school." *Id.* To seek reimbursement, the parent must file a due process complaint, which triggers administrative proceedings beginning with a hearing before an Impartial Hearing Officer ("IHO"). *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)). The IHO hearing is governed by the three-part *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c): "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *See id.*

An IHO's decision may be appealed to a State Review Officer ("SRO"). *See* N.Y. Educ. Law § 4404(1)(c); *W.A.*, 927 F.3d at 133. The SRO "shall review and may modify ... any determination of the impartial hearing officer ...." N.Y. Educ. Law § 4404(2). An SRO's decision is the final administrative decision, but "[t]he IDEA permits a dissatisfied party to challenge an SRO's decision in state or federal court." *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 164 (2d Cir. 2021) (citing 20 U.S.C. § 1415(i)(2)(A)).

II.     BACKGROUND

   A. Educational Background

Plaintiff S.B. is the mother of A.W., a child with a disability who resides in New York City. Plaintiff A.W. was thirteen years old at the start of the 2020-2021 school year. In December 2019, A.W. was diagnosed with Major Depressive Disorder, Disruptive Mood Regulation Disorder, Attention-Deficit/Hyperactivity Disorder, Oppositional Defiant Disorder, and Specific Learning Disorder, with Impairment in Written Expression by Clinical Neuropsychologist David H. Salsberg. In 2019-2020, A.W. attended a DOE middle school ("75 Morton"). During that time, he "started school refusing" and eventually needed to spend material portions of the school year hospitalized at the Bellevue hospital for his emotional needs. On September 9, 2019, A.W.'s IEP Team convened, classified A.W. with an Other Health Impairment, and recommended a ten-month program of Integrated Co-Teaching ("ICT") instruction in a general education setting with two forty-minute sessions of counseling per week.

In December 2019, A.W.'s parents obtained a neuropsychological report. The report found that A.W. "had previously exhibited difficulty maintaining friendships, understanding boundaries, and taking responsibility for behaviors as well as non-compliance, suicidal ideation, self-harm, lying, cheating, stealing, school refusal, aggression, defiance, hyperactivity, isolation and eloping." On December 20, 2019, A.W.'s IEP was changed to recommend 12-month services for his Emotional Disturbance classification, with his placement deferred to the Central Based Support Team ("CBST") to identify a New York State Approved Non Public School Placement ("NPS"), for a day program in a 12:1+1 class with two thirty-minute sessions of counseling per week ("Dec. 2019 IEP"). The December 2020 IEP listed an implementation date of December 20, 2019. In early March 2020, two NPSs sent the CBST acceptance offers with

3

unspecified implementation dates, conditioning acceptance of A.W. on changes being made to A.W.'s Dec. 2019 IEP.

On March 18, 2020, A.W. received an amended IEP ("March 2020 IEP") recommending varied sessions of weekly English Language Arts and Math instruction, in a 12:1+1 class, and one 40-minute session of counseling per week.  S.B. was not involved in the development of the March 2020 IEP.  S.B. testified that A.W. was attending a Bellevue hospitalization program from July 1, 2020 through July 10, 2020, at which point, he was discharged.  S.B. testified that. at the time of his discharge, A.W. was on a 90- to 180-day waitlist for an NPS ("Goldsmith's").

**B. School of Urban and Wilderness Survival ("SUWS")**

After researching and speaking to an educational consultant, S.B. determined that a wilderness program would be best for A.W.  A.W. attended SUWS in North Carolina, from July 22, 2020 through October 12, 2020.  S.B. testified that she considered many factors, including her ability to drive there, how quickly A.W. could be placed, the presence of therapy dogs, and having a high staff-to-child ratio.  There is no indication that the parents provided ten-days' prior notice to the District of their intent unilaterally to place A.W. at SUWS.

SUWS is a "wilderness therapy intervention program" that serves adolescents struggling with depression, anxiety and other emotional regulation.  The SUWS program "serves a number of kinds of students... with diagnoses ranging from depression, anxiety, behavioral management, learning difficulties, emotional regulation, [or] attachment issues."  SUWS employs milieu therapy.  Students at SUWS "are together at all times" and "work together in order to prepare meals, set up camp, hike from one campsite to the other, or transition to our base camp."  Students at SUWS camp for most of their time, live in tents and learn to use the bathroom in the wilderness in environmentally conscious ways.  Students also work on their own individual

tasks.  Students are usually with a group of six to eight students and between two and four field staff.  A.W. attended SUWS's Seasons program, which "focuses on the unique development of [their] youngest students, ages 10-14."  The program "provides a therapeutic wilderness milieu while delivering specific interventions that have a strong neurodevelopmental basis."  SUWS describes the curriculum as dynamic treatment that includes a "ropes course, Theraplay, expressive arts, mind-body therapies and experiential interventions."

The SUWS clinical director testified at the IHO hearing that the duration of the program was often between eight to twelve weeks and was individualized to each student.  SUWS helps students navigate conflicts by pushing them to learn empathy, often by using "I feel" statements, and teaching them to take time to calm themselves in learning to respond to negative situations.  The clinical director testified that SUWS is not an academic institution.  The clinical director stated that the student engaged in "psychoeducation", conflict resolution activities and check-ins multiple times a day.  A.W. participated in "milieu therapy" at all times as part of his cohort and also received individual therapy once a week.  SUWS cites scientific studies in support of "milieu therapy."  A.W. also received individual therapy and assignments from a licensed therapist; assignments included topics for journal entries to help him understand his thoughts, feelings and choices.

A.W.'s report card described SUWS as a program designed to be a "powerful intervention for the students that need[ed] structure, supportive counselling, motivation improvement and the development of self-esteem, self-reliance and self-respect."  At SUWS, students complete a written Search and Rescue Manual.  SUWS produces report cards that outline the subject and hours a child spent on each.

5

The SRO characterized the course descriptions for each class as "generic" and found that they do "not include an information specific to the student's participation." The SRO noted that "in effect, the student's 'report card' could have been written for any student but for the number of hours that SUWS attributed to each course description." Lessons are not taught individually, but often simultaneously through activities facilitated by SUWS staff. A.W.'s SUWS report card does not contain grades or assessments. SUWS does not employ any licensed teachers. The students' primary providers are "Field instructors." Field instructors for SUWS have no licensure requirements, but must be 21 years of age and have a high school diploma. The clinical director stated she, "would not say that [SUWS] teache[s]" English, but "we do speak to it when they are working on their assignments."

The SUWS discharge summary described A.W.'s progress in the wilderness program relative to his mental health diagnosis. In regard to academic progress, the clinical director testified that they do not measure progress "through an academic lens."

A.W. transferred from SUWS to Wediko, a residential boarding school specifically for middle and high school boys in Windsor, New Hampshire, which he continues to attend. On September 29, 2020, the parents provided an updated 10-day notice indicating their intent to place A.W. at SUWS and Wediko.

C. IHO Hearing

The administrative proceeding was initiated on September 11, 2020, when S.B. filed a Due Process Complaint. S.B. asserted that the DOE had denied her child a FAPE for the 2020-2021 school year and sought, *inter alia*, funding for her child's placement at SUWS, and the accompanying travel expenses for the 2020-2021 school year.

6

On March 29, 2021, an impartial hearing on the merits took place. The DOE did not present a case in chief. S.B. presented three witnesses, which included SUWS's Clinical Director and S.B. S.B. presented documentary evidence, including the clinical director's resume, SUWS's Program Description, Work Sample Data Collection, Report Card, Discharge Summary, Enrollment Contract, and Tuition Affidavit.

The record closed on May 8, 2021, and the IHO Decision was issued on May 23, 2021, which determined that the DOE had failed to offer a FAPE, that the unilateral placements at SUWS and Wediko were appropriate, and that equitable considerations weighed in favor of the parents. In examining the placement at SUWS, "[t]he record basis underlying the IHO's analysis [of] the appropriateness of SUWS is a citation to a single page of the hearing transcript, wherein the clinical director at SUWS stated '[a]nother way we might say it is that we're giving a student an opportunity for their nervous system to settle down, and we're assessing and learning about a student and how they individually learn so that they've got a stronger threshold to reenter academic life.'" Accordingly, the IHO ordered Defendant to fund SUWS and the accompanying travel expenses for the 2020-2021 school year.

The IHO found that "[t]he curriculum was individualized for his specific clinical needs with his primary therapist." The IHO Decision also discussed the SUWS academic curriculum, which included "work[ing] on constructing sentences, using grammar, handwriting," though the IHO acknowledged testimony that the curriculum is not measured through an academic lens and grades are not documented "since they are not an academic institution." The IHO found that the student made progress using coping skills, emotionally regulating himself, managing restlessness and anxiety, reducing aggressive and nonaggressive misbehaviors and symptoms associated with his anxiety. His communication skills, ability to work with others, flexibility,

7

mood, self-esteem and wellbeing all improved. Because Defendant did not present any evidence and the parent's evidence demonstrated that the District failed to provide A.W. with a placement for the 2020-2021 school year, the IHO found that the District failed to meet its burden of demonstrating that it provided A.W. with a FAPE during the 2020-2021 school year. The IHO found that SUWS "was specially designed to meet [A.W.]'s social emotional and behavior needs by providing individualized support and therapeutic services in a small setting." The IHO reasoned that the program's goal was to help A.W. "regulate his emotions and behaviors in order to attend a traditional academic program." Specifically, the director testified that the placement provided A.W. "with the opportunity for his nervous system to settle down," and they could assess how A.W. individually learns so he could reenter academic life. The IHO concluded that A.W. "made enough progress . . . in order for him to be discharged into a traditional academic and therapeutic setting." The IHO's decision concluded by noting, "I have considered the Parent's other requests for relief in the Due Process Complaint and they have been denied for lack of evidence in the record."

### D. SRO Appeal

On July 2, 2021, the DOE filed a Request for Review. The sole issue on appeal was the IHO's finding that SUWS was an appropriate unilateral placement.

The SRO issued his decision on August 5, 2021. The SRO reversed the IHO's decision, concluding that "the evidence in the hearing record is insufficient to establish that S.B.'s unilateral placement of the student at SUWS for the relative portion of the 2020-2021 school year was appropriate," noting that the record basis for the IHO's finding was a single record citation. The SRO determined that the record evidence was insufficient to find that SUWS provided A.W. with educational instruction specially designed to meet his unique needs. The

report card indicated that all students were expected to complete "a rigorous course of experiential instruction" that addressed the "fundamental curriculum areas" of creative writing, healthy living, psychology, physical education, social studies, outdoor leadership, English, environmental studies, first aid, personal development, and home economics."  The SRO found that the report card corroborated Defendant's argument that SUWS offered little instruction that fit within academic areas, consistent with the clinical director's testimony.  The SRO further noted that "there is very limited evidence that a social worker works with the student on at least two sessions per week of unknown duration, which although not directly academic, could fall into the category of a related service, and counseling is clearly relevant to the student's social emotional needs."  The SRO noted various improvements described in the SUWS discharge summary relative to A.W.'s mental health diagnoses, and that the clinical director testified that the student had made progress, including with respect to his ability to use coping skills, emotionally regulate himself, clearly state his thoughts and feelings, and work with others towards solutions.  Although the discharge summary indicated that A.W. would likely struggle with the transition to a therapeutic boarding school, SUWS staff determined that A.W. was ready for the transition and would succeed once he established a structured routine.

      The SRO concluded that the totality of the circumstances most strongly supports the conclusion that SUWS does not view itself as an alternative schooling environment, and that the evidence showed it did not provide an opportunity for the student to receive any educational instruction from teachers.  The SRO found that the program instead focused almost entirely on treating the student from a mental health perspective.  As to the program's therapeutic aspect, the SRO noted that the duration and any known benefits with respect to A.W.'s meetings with the social worker were unknown, and the remaining evidence of milieu therapy was general, not a

substitute for a program that assesses a student's learning, or awards or tracks credit or support the development of educational skills, other than perhaps some physical education and outdoor survival skills. The SRO noted that the institution's alleged status as state-approved "does not bear out in the record, at least in terms of a state educational authority."

The SRO found that the parents viewed SUWS as a form of residential placement, and that circuit courts addressing such placement have offered several varying tests as to whether a district must pay for medical or mental health services in such settings under the IDEA. While the tests may vary, the SRO explained that "[a]ll of the tests however have a clear relationship between the noneducational, medical or mental health services being provided and the educational opportunities such services were designed to support." Here, the SRO found that the educational opportunities at SUWS "were insufficiently clear from the record, especially when the clinical personnel providing mental health services essentially conceded that SUWS does not attempt to view the student through an academic lens." The SRO further noted that there was no evidence of cooperation with a local district or other educational institution, nor contact with the student's district of residence to ascertain educational objectives for the student. Ultimately, the SRO concluded that the placement was not appropriately designed to further A.W. educationally, and instead "was putting that endeavor off for another institution to address at a later time."

### III. STANDARD

A motion for summary judgment in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment motion." *C.S.*, 990 F.3d at 165 (internal quotation marks omitted).

In reviewing an SRO's decision, a district court determines whether the SRO's decision is supported by "the preponderance of the evidence, taking into account the evidence in the

administrative record and any further evidence presented before the District Court by the parties." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 367 (2d Cir. 2006) (internal quotation marks omitted); *accord A.U. et al. v. New York City Dep't of Educ.*, No. 15 Civ. 6777, 2016 WL 4508454, at *7 (S.D.N.Y. Aug. 25, 2016). "[C]ourts must give due weight to the state administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *C.S.*, 990 F.3d at 165 (internal quotation marks omitted). Conclusions of law are not accorded any deference. *Id.* "Where an IHO and SRO reach conflicting conclusions, a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *Id.* (internal quotation marks omitted). In deciding how much deference to accord the IHO and SRO, a reviewing court may take into account "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks omitted); *accord J.S. v. New York City Dep't of Educ.*, 648 F. App'x 96, 99 (2d Cir. 2016). "The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). "Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012).

11

## IV. DISCUSSION

### A. IDEA Claim

There is no dispute that Defendant failed to provide a FAPE, nor does it appear that Defendant disputes the necessity of a residential placement. The SRO correctly applied the *Burlington/Carter* test to determine that A.W.'s placement at SUWS was not "appropriate." Under the *Burlington/Carter* test, the private school placement "must be reasonably calculated to enable the child to receive educational benefits," *W.A.*, 927 F.3d at 146, "such that the placement is likely to produce progress, not regression." *T.K. v. New York City Dept. of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) (internal quotation marks omitted). In making this determination, courts "consider the totality of the circumstances in determining whether the placement reasonably serves a child's individual needs." *W.A.*, 927 F.3d at 146. (internal quotation marks omitted). "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit . . ." *Id.* (internal quotation marks omitted). "The test for the private placement is that it is appropriate, and not that it is perfect." *T.K..*, 810 F.3d at 877-78 (internal quotation marks omitted). "Parents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a FAPE." *Id.* at 878 (internal quotation marks omitted).

Here, the SRO Decision is entitled to deference because it involves a matter "requiring educational expertise" and is well reasoned. *W.A.*, 927 F.3d at 144 (internal quotation marks omitted); *see also Bd. of Educ. of Wappingers Cent. Sch. Dist. v. M.N. ex rel. J.N.*, No. 16 Civ. 9448, 2017 WL 4641219, at *9 (S.D.N.Y. Oct. 13, 2017) ("The appropriateness of a student's placement is a determination that requires educational expertise, and thus . . . should be accorded

deference."). In considering the totality of circumstances in this case, the SRO took into account A.W.'s progress, which is "'relevant' . . . but by no means dispositive in 'demonstrating that a private placement was appropriate,'" *FB v. New York City Dep't of Educ.*, 132 F. Supp. 3d 522, 555 (S.D.N.Y. 2015) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 115 (2d Cir. 2007) ("[S]uch progress does not by itself demonstrate that a private placement was appropriate."), and the extent to which that progress was adequately reflected in the record. Specifically, the SRO explained that although "there was no process used for measurement of progress" with respect to the SUWS report card, the SUWS discharge summary noted a number of areas of progress relative to A.W.'s mental health diagnoses.

In addition to progress, the SRO considered the therapeutic aspects of the program, and found that the evidence of "milieu therapy" was general, and while "[t]here is evidence of therapy provided by a social worker two times per week, . . . the duration of the sessions is unknown and there are no notes or other objective documentation that might have been offered to support how the student benefited from that related service." The SRO concluded that "the educational opportunities . . . were insufficiently clear from the record" especially in light of (i) the clinical director's statement that "SUWS does not attempt to view the student through an academic lens;" (ii) the fact that the program "focused almost entirely on treating the student from a mental health perspective" and (iii) "[t]here is no evidence of cooperation with a local district of location or other educational institution . . . to ascertain educational objectives for the student."

The SRO carefully and thoroughly weighed the evidence, cited relevant case law and legal standards, and provided a detailed, record-based decision. Plaintiffs misconstrue the SRO Decision by arguing that it adopted "outlying case precedents" from other circuits. The SRO did

not rely on the out-of-circuit decisions in discussing the residential aspect of SUWS. Rather, the SRO noted that circuits have taken different "and at times conflicting" approaches on that issue, and cited those decisions as examples of varying approaches. The SRO then noted the similarity among the different approaches, i.e., the relationship between noneducational needs and "the educational opportunities such services were designed to support." This is consistent with Second Circuit law, which focuses on "whether the child requires the program to receive *educational* benefit." *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997) (emphasis added); *accord M.H. v. Monroe-Woodbury Cent. Sch. Dist.*, 296 F. App'x 126, 128 (2d Cir. 2008); *see also Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687, 694 (3d Cir. 1981) ("[t]he statutory language requires courts to assess the *link* between the supportive service or *educational* placement and the child's learning needs.") (emphasis added). Here, the SRO found that the educational aspect was deficient.

  Plaintiffs argue that the SRO erred by applying a "heightened" standard by overemphasizing academic advancement at SUWS, rather than conducting a holistic review of whether SUWS enabled A.W. to transition into an academic program. As described above, the SRO conducted a holistic review by considering all aspects of the SUWS program, including the therapeutic and academic opportunities and A.W.'s progress in those areas. The weight that the SRO places on one aspect of a placement, while considering the totality of the circumstances, is squarely within the SRO's discretion as an area of educational expertise. Plaintiffs cite no binding authority that states that the appropriateness of a placement should turn on potential future educational benefits that the student may enjoy at a subsequent placement.

  Plaintiffs' reliance on *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006), is misplaced. *Frank G* did not involve "wilderness therapy relief," as Plaintiffs claim. The

private placement was to a parochial school with a traditional academic curriculum (e.g., reading, vocabulary, mathematics, spelling, social science), standardized tests and a grading system. *Id.* at 361. The court in *Frank G.* applied the *Burlington/Carter* standard, which the SRO appropriately applied here, as discussed above.

Plaintiffs may instead be thinking of *Reg'l Sch. Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. M.*, No. 3:07 Civ. 1484, 2009 WL 2514064, at *14-15 (D. Conn. Aug. 7, 2009), where a district court found that the record supported the hearing officer's conclusion that a private placement at a wilderness program was appropriate. While decision does not describe the details of the program, the case is distinguishable because the testimony regarding the appropriateness of the program, how it met the student's needs and the student's progress were "essentially unchallenged," and the programs were accredited therapeutic programs licensed by the state.

### B. Non-IDEA Claims[1]

Although Plaintiffs reference non-IDEA claims in their Notice of Summary Judgment Motion and memoranda of law, neither party substantively addressed the claims in their opening memoranda of law. For the first time in their Opposition, Plaintiffs argue that they are entitled to summary judgment on their non-IDEA claims because Defendant did not address them in its Answer or cross-motion for summary judgment. This argument is unpersuasive. First, Defendant denied the allegations relating to the non-IDEA claims in its Answer. Second, in their Opposition, Plaintiffs concede "[t]he legal standard for finding a Section 504 violation is heightened to the IDEA's standard, and requires a showing of a gross misconduct or gross negligence." Because Plaintiffs' IDEA claim fails, these non-IDEA clams necessarily fail.

---

[1] Plaintiffs' § 1983 claim is abandoned. Plaintiffs' Notice of Summary Judgment Motion does not reference the § 1983 claim, nor was it substantively addressed in any of Plaintiffs' memoranda of law.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment motion is denied and Defendant's motion for summary judgment is granted. The Clerk of Court is respectfully directed to close all outstanding motions and close the case.

Dated: September 1, 2022
       New York, New York

*[signature]*
LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE